UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OSK VIII, LLC,<br><br>              Plaintiff,<br><br>vs.<br><br>NEW YORK TAXI WORKERS ALLIANCE,<br><br>              Defendant. | Case No.: 22-Civ.-_____<br><br>**COMPLAINT** |

Plaintiff OSK VIII, LLC ("Plaintiff" or "OSK"), by and through its counsel, Greenberg Traurig, LLP, as and for its complaint against defendant New York Taxi Workers Alliance ("Defendant" or "NYTWA"), states and alleges as follows, upon knowledge as to Plaintiff's own acts and upon information and belief as to all other matters:

**PRELIMINARY STATEMENT**

1.      Just before the COVID-19 pandemic, Plaintiff acquired two portfolios of 100%-performing loans secured by, among other things, New York City taxicab medallions. Today, the combined portfolio consists of about 300 loans with medallions as collateral—about 2% of all medallions issued by the New York City Taxi & Limousine Commission ("TLC").

2.      When Plaintiff acquired its medallion loan portfolio, all loans were performing and all borrowers were paying as agreed. After the citywide pandemic shutdown, nearly all loans stopped performing, at least temporarily. But Plaintiff, through its servicers, has worked to accommodate payment plans for individual borrowers, case-by-case, depending on their documented ability to pay and their individual decision to continue to drive a taxi or leave the

industry.  Plaintiff's efforts have met with steady success: despite the pandemic, about 75% of Plaintiff and its affiliate's loans are paying as agreed as New York City has re-opened and taxi ridership has steadily increased.

3.      Plaintiff nonetheless has faced recurring attacks from NYTWA, which is <u>not a registered union and has no collective bargaining authority</u>.  NYTWA boasts that it answers to no one.  NYTWA touts its "uncompromising militancy" and "nonstop militant action," unchecked by the rules that govern everyone else.  The lack of restraints has emboldened NYTWA in its campaign to disrupt Plaintiff's contractual relationships with individual borrowers.

4.      The subject of NYTWA's campaign is the Supplemental Loan Deficiency Program, or MRP+ ("Program").  The City, having received significant revenue from medallion sales and transfers, recently announced the Program to help lower medallion owners' debt.  Lenders must agree, in part, to reduce outstanding loans to a principal balance of $200,000 and cap debt service payments at $1,122 per month.  In exchange, the City has said, in part, that it intends to guarantee the principal and interest on the restructured loan.

5.      As of today, the Program is <u>not funded, not fully documented, and not operational</u>. Plaintiff had no role in developing any aspect of the Program.  Meanwhile, Plaintiff, through its servicers, is still working case-by-case to temporarily modify individual loans where, among other things, a driver-owner has shown genuine financial hardship.

6.      Still, NYTWA demands more.  NYTWA seeks to coerce Plaintiff into restructuring its entire loan portfolio under the Program—even where the individual borrower is currently paying as agreed or has a proven ability to pay.  But none of Plaintiff's borrowers has retained NYTWA as legal counsel.  Nor has any borrower given NYTWA a Power of Attorney.  NYTWA itself proclaims that it is not certified as a union.  <u>NYTWA has no privity of contract with Plaintiff</u>

2

and no authority to negotiate or settle any loan. Yet it repeatedly and tortiously interferes with Plaintiff's bilateral contractual lending relationships.

7.      NYTWA is falsely representing to Plaintiff's borrowers that the Program universally and automatically applies to all of Plaintiff's loans—such that all principal balances are capped at $200,000 and all debt service payments at $1,122 per month. Recently, NYTWA instructed and advised one driver-owner, known here as "Company 1," to strategically default on its loan by withholding its contractually required debt service payment and instead pay only $1,122 per month.[1] Before NYTWA's misconduct, Company 1 was in good standing and paying as agreed. Now, as a direct result of NYTWA's interference, Company 1 is in breach and default under its loan documents, with $812,426.29 immediately due.

8.      "Uncompromising militancy" and "nonstop militant action" are not tools to disturb lawful transactions. Well before the City announced its own medallion debt relief initiative, Plaintiff was working with individual driver-owners to facilitate payment based on each borrower's unique circumstances. NYTWA may not coerce Plaintiff into a wholesale restructure of its entire portfolio, without regard for the individual loan terms and the individual borrower's documented ability to pay. And to get its way, NYTWA may not inject itself into Plaintiff's ongoing contractual relationships with individual borrowers. To protect the integrity of its contracts and stop NYTWA's intentionally disruptive behavior, Plaintiff therefore brings this action for tortious interference with contract.

---

[1] Because Plaintiff's claim is against NYTWA, and not any individual borrower, Plaintiff does not wish to publicly name Company 1 or its principal. Plaintiff will identify Company 1 to NYTWA on service of process and will provide unredacted copies of the exhibits.

## THE PARTIES

### A.      Plaintiff OSK VIII, LLC.

9.      Plaintiff is a Minnesota limited liability company with its registered office and principal place of business in Edina, Minnesota.  None of Plaintiff's members is a resident or citizen of the State of New York.  A related entity, O'Brien-Staley Partners ("OSP"), serves as asset manager.  OSP is a Minnesota-based investment firm that operates across four discrete financial business strategies: alternative asset management, market-rate impact investing, nationwide loan servicing, and deposit management.

### B.      Defendant New York Taxi Workers Alliance.

10.      Defendant presents itself as a nonprofit membership organization based in Long Island City, Queens County, New York, and is a citizen of the State of New York.  According to NYTWA, its membership consists of professional drivers in New York City, including drivers of taxis and other for-hire vehicles.[2]  NYTWA's founder and executive director is Bhairavi Desai. Desai's husband, Victor Salazar, is one of NYTWA's directors, and discrete from this action, his own company, Sumak Kawsay LLC, is the borrower on a loan with Plaintiff's affiliate.

11.      NYTWA  is not a union under the National Labor Relations Act or any other statute and is not certified by the National Relations Board.  NYTWA has no collective bargaining power and no authority to enter into a collective bargaining agreement.  In Desai's words:  "We have

---

[2] As a 501(c)(3) organization, NYTWA must file a Form 990 with the IRS.  But according to the IRS website, it appears that NYTWA has failed to file a Form 990 for the last two years.  In its 2019 Form 990, NYTWA reported revenue of $1,508,098 and expenses of $1,272,188, and yet reported zero compensation for any directors or officers.

worked outside of the National Labor Relations Act.  We have no dues check-off.  Nobody has to recognize us at the table."

12.     NYTWA instead prides itself on "uncompromising militancy."  To get what it wants, NYTWA resorts to "nonstop militant action" that disrupts the status quo and disregards the governing rules.  Desai again: "We're not looking for a seat at the table.  We want to dismantle that table. . . ."  Desai continued:  "The way we built our movement—because we didn't have a contract, we didn't have recognition, no one had to come to the table and meet with us—we did it by militant action. . . . That sense of militancy—we need to set that ablaze throughout all the industries in our country."

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) because this action is between citizens of different States and the amount in controversy exceeds $75,000.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2).

## FACTS

15.     To date, New York City has issued 13,587 individually numbered taxicab medallions, which license the holder to operate in the City.  The medallion itself is a metal plate affixed to the cab's hood.  The TLC controls all sales of new medallions through auctions and oversees all transfers of existing medallions between third parties.

16.     From 2004 through 2014, the TLC sold more than 1,000 new medallions through a series of auctions.  The purpose of these auctions was to generate significant municipal revenue.  The auctions more than accomplished their goal: over a ten-year span, municipal revenue from auction sales and taxes on third-party medallion transfers exceeded $855 million.

**A.**     **Plaintiff Acquires Medallion Loans And, Post-Pandemic, Works Case-By-Case With Individual Driver-Owners To Facilitate Payment As Needed.**

17.     In 2018 and 2019, Plaintiff and an affiliate acquired all right, title, and interest in two portfolios of commercial loans that were used to finance New York City taxi medallions and for various other business purposes.  While scoping its investment, Plaintiff limited its credit risk only to performing loans.  Both portfolios were screened to be 100% performing when acquired— that is, all borrowers were paying as agreed.  OSP, as Plaintiff's asset manager, thus showed long-term confidence in these specific borrowers who, years after the influx of ride-share services like Uber and Lyft, were still operating their taxis and paying their loans.  OSP felt confident that these driver-owners had proven themselves to be good operators and credit-conscientious borrowers, and that with patience these credits would continue to perform well.  As of today, Plaintiff and its affiliate are the lenders on about 300 loans with medallions as collateral—about 2% of all New York City medallions.

18.     With the citywide pandemic shutdown, nearly all loans stopped performing, at least for a time.  But, through their servicers, Plaintiff and its affiliate have worked case-by-case to accommodate temporary payment plans for individual driver-owners with documented financial hardship.  Today, about 75% of the loans are paying as agreed and in good standing with Plaintiff and its affiliate.

19.     Through the hardship accommodation process, the servicers communicate directly with each individual borrower or the borrower's authorized representative.  An authorized representative may include either the borrower's retained legal counsel (such as an attorney with NYLAG, the New York Legal Assistance Group) or the borrower's designated attorney-in-fact (with evidence of Power of Attorney under New York General Obligations Law, Article 5, Title 15).

20.     The hardship accommodation process starts with a core question:   whether the individual borrower prefers to (1) continue to drive a taxi, or (2) leave the industry.   If the borrower's principal wishes to continue to drive, the servicers work to find an affordable temporary weekly payment.   If the borrower wishes to leave the industry, the servicers encourage the borrower to sell or surrender the medallion and then address any deficiency balance on an individualized basis.

21.     For individual qualifying borrowers who wish to continue to drive, Plaintiff has made available a series of "Temporary Modification Agreements" ("TMA") spanning six months each.   To qualify, the borrower's principal must be an individual driver-owner, not a financial investor who leases or otherwise uses a medallion to generate income without driving the taxicab. The driver-owner also must complete a hardship application documenting a genuine inability to pay the debt service under the original loan documents.

22.     Under each TMA, Plaintiff and the driver-owner agree to temporarily modify the payment amount and frequency for a six-month "Accommodation Period."   In general, this temporary amount started at $100 per week per medallion in the depths of the shutdown in March 2020 and has gradually increased since.   The temporary amounts may vary with the driver-owner's individual circumstances, but for most driver-owners, the current TMA requires payments of $300 per week through May 31, 2022 (about $1,200 per month), and then $350 per week from June 1, 2022, through August 31, 2022 (about $1,400 per month).   Barring further agreement, the loan reverts to its original terms once the Accommodation Period expires.   The driver-owner agrees to make all loan payments electronically through Automatic Clearing House ("ACH"), both during and after the Accommodation Period.

23.     After Plaintiff had begun loan restructurings with qualifying driver-owners, the City announced its first Medallion Relief Program ("MRP") in September 2021.  With the MRP, the City established a $65 million fund to provide grants "to economically distressed individual medallion owners."   According to the City, for an individual borrower, a grant may include $20,000 as a down payment to restructure loan principals and set lower monthly payments, as well as up to $9,000 for monthly debt relief payments.  Plaintiff has participated in this program, as appropriate case-by-case, since its activation.

**B.     The City, NYTWA, And Marblegate Announce The Supplemental Loan Deficiency Guaranty Program Without Plaintiff's Knowledge Or Involvement.**

24.     In November 2021, the City announced an agreement with NYTWA and Marblegate Asset Management ("Marblegate"), the largest medallion lender, to supplement the MRP with a City-funded deficiency guarantee.  The agreement with Marblegate is known as the Supplemental Loan Deficiency Guaranty Program, or MRP+.  A copy of the joint press release dated November 3, 2021 announcing the agreement is **Exhibit A**.  According to news reports, Marblegate owns about 4,000 loans secured by, among other things, New York City taxicab medallions, which is about 30% market share.   Unlike Plaintiff's portfolio, the bulk of Marblegate's portfolio is believed to be non-performing, such that the borrowers are in default and paying nothing on their medallion loans.

25.     The joint press release stated that Marblegate agreed to "restructure outstanding loans to a principal balance of $200,000, which will be constituted as a $170,000 guaranteed loan, plus a City grant of $30,000.  The terms of the new loan will include a 5% interest rate and a 20-year, fully amortizing term.  This restructuring will cap debt service payments at $1,122 per month for eligible medallion owners."  The release continued:  "The City will provide funding for a

guarantee on the principal and interest for these loans and will work with all other medallion lenders to achieve the same terms."

26.     Plaintiff is not a party to the above-referenced agreement and had no role in negotiating its terms.  The critical document—the guaranty of the restructured loan obligations— has yet to be written.  And the guarantor remains unidentified, raising the risk that there may be no municipal guaranty.  Beyond that, the City has not established if the Program is all-or-nothing, or whether lenders may participate on an individualized, loan-by-loan basis.  To date, the Program is not funded, not fully documented, and not operational.

## C.     OSP Announces It Plans To Participate In The Program On A Loan-By-Loan Basis Tied To The Genuine Hardship Of The Individual Driver-Owner.

27.     NYTWA still seeks to coerce Plaintiff and its affiliate into restructuring medallion loans wholesale as part of the Program—sight unseen, and no matter the actual circumstances and financial means of individual borrowers.  Among other things, NYTWA seeks to compel Plaintiff to reduce the outstanding principal balance on all of its medallion loans to $200,000 and cap all monthly payments at $1,122.  NYTWA seeks to impose these terms indiscriminately across Plaintiff's entire portfolio—no matter the amount remaining on any individual loan; no matter the individual borrower's actual payment history or ability to pay going forward; and no matter the borrower's commitment to continuing as a driver-owner.

28.     NYTWA followed its playbook of "nonstop militant action," laden with inflammatory rhetoric and misleading innuendo.  Through press releases, website postings, social media, and other means, NYTWA crafted a narrative that falsely accused Plaintiff of "harassment" and making drivers' lives a "nightmare."  While Plaintiff and its servicer engaged in lawful activities under the loan documents—including efforts to restructure and temporarily modify

individual medallion loans case-by-case—NYTWA insinuated that Plaintiff was engaging in illegal loan enforcement practices.

29.     On March 29, 2022, the asset manager, OSP, announced that it was willing to participate in the Program once it begins operating—but only on terms that recognize the unique circumstances of each individual driver-owner.  OSP accepted an invitation to participate in MRP+ and "to process hardship application requests in its taxicab medallion portfolio consistent with" the Program.  OSP's press release stated:  "[A] well-documented program would be a welcome addition to the tools available in providing debt relief to taxi drivers.  Critical elements to a successful guaranty program will be the accommodation of weekly payment plans and prioritizing actively driving borrowers."  A copy of OSP's March 29, 2022 press release is **Exhibit B**.

30.     OSP thus made clear that it was prepared to use the Program to restructure the loans of driver-owners who submitted qualifying hardship applications—consistent with Plaintiff's ongoing practice of tailoring accommodations case-by-case to the circumstances of individual borrowers.  But OSP did not agree—and never agreed—that it would participate wholesale in the Program and use it to restructure loans universally across its portfolio.

31.     OSP also recognized that the Program is not yet operational.  Key terms and basic documents are still being finalized.  Thus, OSP announced an interim measure to assist drivers whose loans were in default and who otherwise would face loss mitigation remedies.  OSP announced that, while specific Program terms are being finalized, its loan servicers will not repossess the medallions of "individual owners who keep their loans in good standing via either previously agreed weekly payments or, if no such arrangement exists, then $1,122 monthly payments starting April 1, 2022, as proposed under MRP+."

**D.     NYTWA Makes False Representations To Plaintiff's Borrowers And Instructs Them To Breach Their Loan Obligations.**

32.     Dissatisfied with OSP's well-reasoned position, NYTWA has reverted to its trademark "uncompromising militancy."  NYTWA wants to force Plaintiff to restructure all medallion loans on NYTWA's preferred terms—regardless of the individual borrower's particular circumstances or ability to pay.  NYTWA seeks to inject itself into Plaintiff's contractual relationships with individual borrowers and disrupt the agreed-on terms.

33.     NYTWA has instructed Plaintiff's borrowers to strategically default by not submitting hardship applications, breaching the terms of their existing contractual obligations, and making loan payments only in amounts determined by NYTWA.  NYTWA is falsely representing to these borrowers that the Program automatically and universally applies to Plaintiff's entire loan portfolio—such that, among other things, the outstanding principal balance is capped at $200,000 and the required debt service payment is capped at $1,122 per month.  As a result of NYTWA's false representations and tortious interference, Plaintiff's borrowers have refused to make required payments under their loan documents and instead have strategically defaulted on their loans.

34.     A prime example of NYTWA's tortious interference involves Plaintiff's loan to "Company 1" ("C1 Loan").  Company 1 is a New York limited liability company licensed to operate taxis in all five boroughs.

35.     Plaintiff is the assignee and owner of the C1 Loan, which Plaintiff purchased from the original lender on or about June 20, 2019.  When Plaintiff acquired the C1 Loan, the outstanding principal balance was $786,795.95, the required monthly payment was $2,783.74, and the maturity date was December 1, 2022 ("Maturity Date").

36.     On or about November 27, 2017, Company 1 executed a Promissory Note ("Note") in favor of Plaintiff whereby Company 1 promised to pay to the order of Plaintiff the principal

amount and interest computed from the date thereof.  A copy of the Note is **Exhibit C**.  The Note

and other documents executed in connection with the C1 Loan are the "Loan Documents."  Unless

otherwise defined, capitalized terms will have the meanings given in the Loan Documents.

37.     Under the Note's terms, Company 1 was required to remit regular monthly

payments of principal and interest of $2,783.74.  On the Maturity Date, any unpaid balance of

principal and accrued interest and any related changes will be due.  Failure to pay when due any

installment of principal or interest under the Note, or any other payment due under the Note before

the Maturity Date, constitutes an Event of Default under the Loan Documents.

38.     The collateral securing the C1 Loan includes the individually numbered TLC

medallion owned by and registered to Company 1.  The guarantors on the C1 Loan are: (1) a

separate New York corporation, Company 2, that operates an unrelated business, but is affiliated

by common ownership; and (2) Company 1's principal, who is the primary beneficiary of both

Company 1 and Company 2.  Copies of the Security Agreement, Guaranty, and Pledge Agreement

are **Exhibits D, E, and F**, respectively.

39.      The C1 Loan was in good standing and performing as agreed as of March 31, 2022.

But Company 1 refused to make the monthly payment due under the Note of $2,783.74 for April

and May 2022.  Company 1 told Plaintiff's servicer, AmeriNational Community Services, LLC

("AmeriNat"), that Company 1 had communicated with NYTWA about the C1 Loan.  According

to Company 1, NYTWA represented that the Program applied to the C1 Loan, and contrary to the

terms of the Loan Documents, Company 1 need only make monthly payments of $1,122 as of

April 1, 2022.  For example, Company 1 wrote on March 31, 2022:  "OSP/OSK has agreed to join

into NYC loan guarantee program.  The program asked for $1,122 star[ting] April 1 and the check

is in the mail.  We confirmed with the Union last night who stated our loan with Amerinat is a part of this deal and the information you had as of yesterday afternoon was outdated."

40.     NYTWA's statements to Company 1 were false—and NYTWA knew them to be false.  <u>NYTWA sought to impose on Plaintiff blanket loan terms that Plaintiff had rejected in favor of its customized approach tailored to each individual borrower.</u>  As NYTWA knows, Plaintiff never agreed to a one-size-fits-all principal forgiveness and debt-service cap where, among other things, the borrower has a proven ability to pay.

41.     At all relevant times, Company 1 had the ability to pay the contractually required amount of $2,783.74 per month.  In fact, during a conference call with AmeriNat and Company 1, a representative of Company 1's financial institution stated that Company 1 "always has the funds to make that size payment."  Additionally, Company 1 and its guarantors hold significant assets with fair market values far exceeding the outstanding loan balance.

42.     Still, NYTWA instructed and advised Company 1 not to make the contractually required monthly payments, nor to enter into a TMA that was mutually acceptable to Plaintiff and Company 1.  NYTWA instead instructed and advised Company 1 to make monthly payments of only $1,122, starting April 1, 2022.  Relying and acting on NYTWA's instructions and false representations, Company 1 submitted payments of $1,122 for each of April and May 2022, rather than full monthly payments of $2,783.74 as required under the Loan Documents.

43.     As a result of NYTWA's misconduct, the C1 Loan is now in default.  Upon an Event of Default, Plaintiff may declare all of the sums owed under the Loan Documents immediately due and payable in full.

44.     Under the Loan Documents, Company 1 agreed to pay interest on the aggregated unpaid principal balance of the C1 Loan at the rate of 2.25% per year ("Note Rate").  However,

interest in the Indebtedness after default or maturity shall be due at rate of 15% per year above the Note Rate. Additionally, if any payment is not made within ten days from its due date, Company 1 must pay a late charge equal to 5% of the installment past due.

45. On or about May 20, 2022, Plaintiff, through AmeriNat, as servicer on the C1 Loan, sent Company 1 a demand letter stating that the C1 Loan was in default ("Demand Letter"). The Demand Letter notified Company 1 that it was in default of its obligations under the Loan Documents as a result of its continued failure to pay, when due, any installment required to be made under the Loan Documents, and demanding the immediate payment in full of the outstanding principal balance of the C1 Loan, together with accrued and unpaid interest, late fees, and default interest. A copy of the Demand Letter is **Exhibit G**.

46. Company 1 has defaulted under the Loan Documents due to, among other things, its failure to: (1) pay any installment required to be made under the Note when the installment became due; (2) perform any agreement in the Loan Documents; and (3) remit payment in full in accordance with the Demand Letter.

47. The amounts due and outstanding on the C1 Loan as of May 23, 2022 are as follows:

| | |
|---|---|
| Principal Amount Outstanding as of May 23, 2022 | $774,046.10 |
| Interest through May 23, 2022 | $37,962,62 |
| Late fees owing as of May 23, 2022 | $417.57 |
| **Total as of May 23, 2022** | **$812,426.29** |

48. Due to NYTWA's improper interference with the C1 Loan, Company 1 went from a performing driver-owner in good standing to a borrower in monetary default despite a proven

ability to pay.   Moreover, Company 1 is not the only borrower strategically defaulting at NYTWA's instruction.  <u>NYTWA's unrelenting misconduct jeopardizes Plaintiff's ability to accommodate borrowers who establish genuine hardship and a legitimate need for a temporary modification or loan restructuring</u>.  NYTWA has not been retained as legal counsel to Company 1 or any other borrower.   NYTWA does not hold a duly executed Power of Attorney from Company 1 or any other borrower.   NYTWA has no authority to inject itself into Plaintiff's contractual relationships and disrupt lawful transactions.  Plaintiff therefore brings this complaint for tortious interference with contract.

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACT

49.     Plaintiff restates and incorporates by reference each paragraph set forth above.

50.     A valid and enforceable contract exists between Plaintiff and Company 1. Company 1 is contractually required to, among other things, make a monthly payment of principal and interest of $2,783.74 under the Note.  As of May 23, 2022, the outstanding principal balance under the Note was $774,046.10, plus accrued interest, fees, and expenses.

51.     At all relevant times, NYTWA knew of the Note and its key terms.  On information and belief, Company 1 shared the Note with NYTWA or otherwise advised NYTWA of its key terms.  Among other things, NYTWA knew that the Note:  (1) was secured by a taxicab medallion owned by and registered to Company 1; (2) required a debt service payment greater than $1,122 per month; and (3) bore an outstanding principal balance greater than $200,000.

52.     NYTWA intentionally procured Company 1's breach of the Note without justification.  Despite its knowledge of the key terms set forth above, NYTWA falsely represented to Company 1 that the Program applied to the C1 Loan and that Company 1 need not make a debt service payment greater than $1,122 per month.  NYTWA instructed and advised Company 1 to

submit monthly payments of $1,122 (and not by ACH, as required by agreement).  There was no lawful or permissible basis for Company 1 to withhold the contractually required payment.

53.     But for NYTWA's conduct, Company 1 would not have breached the Note and defaulted under the Loan Documents.  Without NYTWA's interference, the C1 Loan was in good standing and paying as agreed.   Relying and acting on NYTWA's instructions and false representations, Company 1 submitted payments of $1,122 for each of April and May 2022, rather than full monthly payments of $2,783.74 as required under the Loan Documents.

54.     Company 1's failure to pay the monthly amount due of $2,783.74 in April and May 2022 breached the Note and other Loan Documents.  Company 1 defaulted under the Loan Documents due to, among other things, its failure to:  (1) pay any installment required to be made under the Note when the installment became due; (2) perform any agreement in the Loan Documents; and (3) remit payment in full in accordance with the Demand Letter.

55.     As a result of NYTWA's tortious interference, Plaintiff suffered damages in an amount to be proven at trial, but no less than $774,046.10, plus accrued interest, fees, and expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff OSK VIII, LLC seeks judgment in its favor and an order and judgment against Defendant New York Taxi Workers Alliance that grants the following relief:

1.     Granting injunctive relief enjoining NYTWA from: (a) encouraging, advising, or otherwise inciting borrowers to strategically default under the terms of their contracts with Plaintiff or Plaintiff's affiliates; (b) engaging with Plaintiff or Plaintiff's affiliates, or servicers, lawyers, or agents for Plaintiff or Plaintiff's affiliates, without privity of contract; (c) instructing or otherwise advising borrowers, including Company 1, to pay less than the contractually required amount on the borrower's loan with Plaintiff or Plaintiff's affiliate; and (d) representing to Company 1 or any

other borrower on a loan with Plaintiff or Plaintiff's affiliates that the Program applies to the borrower's loan with Plaintiff or its affiliates;

2.      Awarding Plaintiff its costs, including attorney fees;

3.      Awarding Plaintiff monetary damages in an amount to be proven at trial, but no less than $774,046.10, plus accrued interest, fees, and expenses, including pre- and post-judgment interest; and

4.      Granting any other relief to which Plaintiff may be entitled under law, equity, and/or as the Court deems just and proper.

Respectfully submitted,

Dated:  May 24, 2022

**GREENBERG TRAURIG, LLP**

By:   */s/ Michael M. Krauss*
Michael M. Krauss
90 South 7th Street, Suite 3500
Minneapolis, MN  55402
(612) 259-9700
kraussm@gtlaw.com

*Attorneys for Plaintiff*
*OSK VIII, LLC*